UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

       -v-

MILTON BALKANY,

           Defendant.

10 Cr. 441 (DLC)

## SENTENCING MEMORANDUM ON
## BEHALF OF MILTON BALKANY

Dated: New York, New York
      February 9, 2011

KELLEY DRYE & WARREN LLP
Alan R. Kaufman
James M. Keneally
101 Park Avenue
New York, NY  10178
(212) 808-5195

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .............................................................................................. 1

I.      PERSONAL AND FAMILY HISTORY .......................................................................... 2

II.     THE PSR ............................................................................................................................ 5

        1.      Guidelines Calculation Methodology ................................................................... 5

        2.      Abuse of Trust Enhancement ................................................................................. 9

        3.      Prior Arrest ........................................................................................................... 10

III.    EXTRAORDINARY GOOD DEEDS AND COMMUNITY SERVICE ...................... 11

        A.      Bais Yaakov School .............................................................................................. 14

        B.      The Balkany Home ................................................................................................ 23

        C.      Acts of Kindness ................................................................................................... 27

        D.      Family Life ............................................................................................................ 35

CONCLUSION ................................................................................................................................. 35

## TABLE OF AUTHORITIES

### CASES

Koon v. United States, 518 U.S. 81 (1996) .................................................................... 11

Nelson v. United States, 129 S. Ct. 890 (2009) .................................................................. 6

United States v. Alba, 993 F.2d 1117 (2d Cir. 1991) ........................................................ 35

United States v. Booker, 543 U.S. 220 (2005) ............................................................ 1, 11

United States v. Canova, 412 F.3d 331 (2d Cir. 2005) ..................................................... 11

United States v. Cavera, 550 F.3d 180 (2d Cir. 2008) ..................................................... 12

United States v. Galante, 111 F.3d 1029 (2d Cir. 1997) ................................................... 35

United States v. Ovid, 2010 WL. 3940724 (EDNY, October 1, 2010) ............................ 13

United States v. Preacely, 2010 WL. 5156384 (2d. Cir. 2010) .................................... 1, 12

### STATUTES

18 U.S.C. § 3553(a)(1) ............................................................................................... 1, 9,11

18 U.S.C. § 873 ...................................................................................................................... 5

18 U.S.C. § 875(d) ................................................................................................................. 5

## PRELIMINARY STATEMENT

This Memorandum is submitted in anticipation of the sentencing of Milton Balkany scheduled for February 18, 2011.  In Part I, we review Rabbi Balkany's biographical information and family history and circumstances.  In Part II, we review the Probation Department's Pre-Sentencing Report ("PSR") and note our objections to some of its content and to its calculations pursuant to the United States Sentencing Guidelines ("USSG").  In Part III, we review and discuss the extraordinary good deeds which Rabbi Balkany has performed over the decades, make reference to some of the dozens and dozens of letters written on Rabbi Balkany's behalf which attest to a lifetime of service to his community (see accompanying Addendum), which we submit warrants substantial consideration by the Court and ultimately a significant reduction from the sentencing range produced by application of the advisory Guidelines calculations.  If ever there was an overwhelming case to be made for the mitigating circumstances envisioned by the "history and characteristics of the defendant" provision of 18 U.S.C. § 3553(a)(1), Rabbi Balkany's life-long record of giving to the community provides the seminal case.[1]

We recognize the gravity of the defendant's conduct.  Yet, it is undeniable that Rabbi Balkany's conduct was not designed to enrich himself, but rather to save his school from the dire financial condition it was in.  It was born of desperation, highlighted by the defendant's response to what he perceived as SAC's delay in making the  "contribution" - - he contacted the United States Attorney's Office in order to turn up the heat on SAC - - a desperate act, which under any rational analysis could only blow up in his face.

---

[1]     "[T]he Sentencing Reform Act as interpreted and rendered constitutional by the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), requires sentencing courts to treat the Guidelines only as a starting point, and then to craft an appropriate sentence taking full account of 'the history and characteristics of the defendant.'  18 U.S.C. §3553(a)(1)." United States v. Preacely, 2010 WL 5156384 at *11 (2d. Cir. 2010) (J. Lynch concurrence).

The school - - Bais Yaakov - - and its dire financial condition, forms the backdrop for what occurred. Seeking to save and preserve a noble charitable and educational institution certainly does not excuse the defendant's conduct, but it should at least distinguish this case from almost all other extortion, blackmail, and fraud cases in which personal greed and financial gain are the usual - - and venal - -  motivating factors.

## I.  PERSONAL AND FAMILY HISTORY

Milton Balkany is 64 years old and was born in Detroit, Michigan, the younger of two sons born to Samuel and Rose Balkany. Samuel was a baker, and later a General Motors plant employee, and Rose was a secretary. At an early age, Rabbi Balkany was determined to pursue religious study, and so at the age of 13 he left his family in Detroit to study at a yeshiva, Torah Vodaath in Brooklyn, living at a school dormitory while he completed his studies. He was ordained a rabbi in 1969, and graduated from the yeshiva in 1970, after having received a Masters degree from the University of Detroit in 1969.

Rabbi Balkany met his future wife, Sarah Rubashkin, on a flight from Florida to New York in February 1968. They were married eight months later, and settled in the Boro Park section of Brooklyn, where the Orthodox Jewish community has a strong presence. In 1972, they moved into the house where they raised their family, and where they still live today.

Rabbi Balkany's passion throughout his adult life has been the education of Jewish girls. Upon his graduation from Yeshiva Torah Vodaath, Rabbi Balkany became the principal of the Beth Yaakov Academy, a girls' school in Brooklyn. Rabbi Balkany stayed at Beth Yaakov only a short while before establishing a new school, Bais Yaakov of Brooklyn, which he opened in

Boro Park in or about 1971.[2] Rabbi Balkany founded Bais Yaakov of Brooklyn with one goal: providing a Jewish education to every girl who came through its doors. This meant accepting students who had been turned away from other schools, either because their families could not afford tuition, or because they had learning disabilities which rendered them undesirable in the eyes of other schools. Rabbi Balkany threw himself into every aspect of the school. Rabbi Balkany greeted students as they entered in the morning, to see for himself how they were faring. He dealt with student issues and problems as they arose, and made regular rounds of classes to monitor the work being done. He took an active role in shaping Bais Yaakov's curriculum. He looked after the school property to make sure that it was well-maintained and safe for the students. He also carried on the with the constant struggle that many, if not most, religious schools face – finding the funds necessary to keep the school going. Rabbi Balkany raised funds through donations, charged tuition to those parents who could afford it, and searched for ways to make ends meet.

Ultimately, the cost of maintaining Bais Yaakov of Midwood proved too great, and in 2005 the school sought bankruptcy protection and ultimately moved to a smaller building in Midwood. However, Rabbi Balkany insisted on trying to continue the school, even in its reduced state, and did so even with his prosecution in this case hanging over him.

As we state in detail later on in this submission, Rabbi Balkany and his wife also see it as their mission to provide counsel and comfort to others in their community when no one else can, or will. Their Friday night Shabbat dinner, at which all are welcome, is just the most obvious example of how Rabbi Balkany and his wife cause their actions to speak for their beliefs. We

---

[2]    At this juncture, it might be beneficial to explain that "Bais Yaakov" (Hebrew for "House of Jacob") is a name ubiquitously given to Orthodox schools dedicated to the education of Jewish girls.

will not go on at length in this section about their commitment to the Boro Park community, and how their generosity and openness reflects the fact that they truly believe that everyone is a neighbor worthy of their attention; we will let the letters of those whose lives they have touched perform that task. At this point it suffices to say that Rabbi Balkany has led a life of service and commitment, and has taught others to do the same, by both his words and deeds.

While working over the last 40 years to forge and maintain a school which could have a lasting presence in his community, and while showing unstinting devotion to his community, Rabbi Balkany was an admirable and loving husband and father. Family is paramount in the Orthodox community in Boro Park. Large families are common, and the Balkanys are no exception. Their 42 year marriage has borne 13 children and 35 grandchildren, with two more grandchildren on the way. Sadly, one child, the Balkanys' 21 year-old daughter Naomi, suffers from Down Syndrome. The Rabbi and Mrs. Balkany send Naomi to a daytime program and provide her with a loving, nurturing environment at home. Naomi requires considerable care at home, and Rabbi Balkany has an especially close relationship with her. She has come to emotionally rely on him more than she does any other member of the Balkany family.

Fortunately, and perhaps remarkably, all of the other Balkany children are productive, hard-working and stable. They are teachers, business owners, students and homemakers, and share their parents' commitment to their faith and their family.

Perhaps not surprisingly, Rabbi Balkany's schedule has caused him to pay less attention to his health than he should. Rabbi Balkany suffers from diabetes and coronary artery disease, for which he takes various medications daily. In 2005, Rabbi Balkany had an angioplasty and required a stent to be inserted to alleviate arterial blockage. Notwithstanding these medical

4

roadblocks, Rabbi Balkany has continued to be an energetic presence in his community and the bedrock of his family.

## II.  THE PSR

1.      **Guidelines Calculation Methodology**

The PSR has calculated Rabbi Balkany's sentencing range by using the grouping provisions of Chapter 3, Part D of the Sentencing Guidelines.  The methodology of these calculations results in the two-year extortion count driving the Guidelines rather than the twenty-year fraud count.  While hewing to the strict letter of the grouping provisions, this result actually stands the clear intent of Chapter 3, Part D on its head.  The calculations are, we respectfully submit, illogical on their face.  In the face of such illogic, the Court can, and should, utilize a different means of calculating the Guidelines range in this case, one which is more clearly in keeping with the Guidelines' intent.

The Introductory Commentary to Chapter 3, Part D states that the Part is designed to determine "a single offense level that encompasses all the counts of which the defendant is convicted."  The Commentary further explains that "[s]ome offenses that are charged in multiple-count indictments are so closely intertwined with other offenses that conviction for them ordinarily would not warrant increasing the guideline range. . . . In essence, counts that are grouped together are treated as constituting a single offense for purposes of the guidelines."  As such, "when offenses are closely interrelated, group them together for purposes of the multiple-count rules, and *use only the offense level for the most serious offense in that group*." [emphasis added]. Id. In other words, the "most serious offense" is that with the highest guidelines range, and not the offense with the greatest statutory maximum.  This is an unremarkable rule to apply in most grouping cases.  In Rabbi Balkany's case, however, it results in a gymnastic procedure whereby the guideline range applicable to an offense for which the maximum sentence is two

years (extortion) is greater than that applicable for an offense whose statutory maximum is twenty years (wire fraud), and the former becomes the operable range. This convoluted and unfair analysis cannot be what Congress and the Sentencing Commission intended.

As the Supreme Court recently said, "The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." Nelson v. United States, 129 S.Ct. 890, 892 (2009)(emphasis added). The methodology utilized in the PSR to calculate the sentencing range illustrates the wisdom of that pronouncement. The methodology implicates the interplay between the statutes of which the defendant stands convicted and the Guidelines sections which correlate to those statutes. A number of anomalies emerge from the methodology.

The first is the peculiar anomaly associated with the extortion and blackmail charges. Count One charged extortion in violation of 18 U.S.C. § 875(d). Count Three charged blackmail in violation of 18 U.S.C. § 873.

Section 875(d) (entitled "Interstate communications") reads as follows:

> "Whoever, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee or of another or the reputation of a deceased person or any threat to accuse the addressee or any other person of a crime, shall be fined under this title or imprisoned not more than two years, or both." (Emphasis added.)[3]

Section 873 (entitled "Blackmail") reads as follows:

> "Whoever, under a threat of informing, or as a consideration for not informing, against any violation of any law of the United States, demands or receives any money or other valuable thing,

---

[3]    Sub-sections (a), (b), and (c) provide for higher maximum penalties in extortion cases involving kidnapping and ransom demands or threats to do so. These sub-sections have no application to this case.

shall be fined under this title or <u>imprisoned not more than one year,</u> or both." (Emphasis added).

The anomaly emerges when the Guidelines section pertaining to these crimes is considered. The applicable Guideline is § 2B3.3 ("Blackmail and Similar Forms of Extortion"), which was used in the PSR. It begins with a Base Offense Level of 9, to be increased by the number of levels from the table in §2B1.1 based on the amount demanded, which the PSR calculates as $4 million. Based on that figure, the PSR adds 18 levels, for a total of 27. At Level 27, the Guideline range is 70-87 months,[4] well in excess of the maximum possible punishment of the extortion (two year) and blackmail (one year) statutes.

Another anomaly emerges upon comparing §2B3.3 with §2B3.2 ("Extortion by Force or Threat of Injury or Serious Damage"). This latter section is designed to cover more serious types of extortion. Yet, if this section were utilized to calculate the defendant's sentence, the Base Offense Level would be 18, and then the increase for amount demanded would be 6 (cross-reference to §2B3.1(b)(7) as per §2B3.2(b)(2)), for a Total Offense Level of 24. Curiously, the more serious extortion Guidelines section produces a lower Total Offense Level. And, both extortion/blackmail sections produce Guidelines ranges well in excess of the maximum possible punishment available under the statutes governing those crimes.

The defendant's high sentencing range is possible primarily because the wire fraud count has a maximum penalty provision of 20 years imprisonment[5], swallowing the three year maximum exposure generated by the extortion and blackmail counts if imposed consecutively.

---

[4]     Ultimately, the PSR reaches a Total Offense Level of 29, adding a 2 point adjustment for "abuse of trust." We address that at p. 9 <u>infra.</u>

[5]     We do recognize that if the wire fraud count were eliminated, the maximum possible punishment on the three remaining counts, including the false statements to the United States Attorney's Office, would total eight years if the maximum terms of imprisonment were imposed consecutively.

This is anomalous because the essence of the defendant's criminal activity was extortion and blackmail, not fraud.  Indeed, if Regensberg <u>had</u> information damaging to SAC, then Balkany's proposition to SAC would be extortionate but not fraudulent.  Even if Balkany made isolated misrepresentations to SAC (e.g., the United States Attorney's Office is meeting with Regensberg), the essence of the criminal conduct remains extortion and blackmail, not fraud.  Those isolated misrepresentations, which do not define the essence of the criminal conduct, should not determine the parameters of the available sentencing options.  And the sentencing options available under the wire fraud count should not govern, when the sentencing range is driven by the extortion Guidelines, not the fraud Guidelines.

As stated, the PSR resorts to Guidelines §2B3.3 as the relevant section to calculate the sentencing range, which turns out to be either 70-87 months or 87-108 months depending on whether the abuse of trust enhancement is applied.  Yet, the maximum possible sentence for the crime of extortion is 24 months.  It is only by resort to the statutory penalty available under the wire fraud statute that the above sentencing range can be reached.  We submit that if the wire fraud charge is to control the available sentencing range, then §2B1.1 should be used to calculate the range.[6]  That calculation starts with a Base Offense Level of 7; is increased by 16 levels for a loss of "more than $1,000,000."[7]  The Total Offense Level would thus be 23,[8] and the sentencing range would be 46 to 57 months.

---

[6]    Alternatively, if the extortion Guideline section governs, then the sentencing options under the extortion statute should apply.

[7]    It would not be "more than $2,500,000" because "loss" is different than "amount demanded", and in this case SAC's loss would have been the $2 million "contribution" plus the loss of the use of the $2 million loan which would have been fully repaid over 80 months.  We calculate the foregone interest on the $2 million loan to be $355,943.17 (using a 5% rate of return), for a total loss of $2,355,943.17.

[8]    Again, we are not including the 2 point enhancement for abuse of trust, for reasons explained at p. 9 <u>infra</u>.  Also, we do not include the 2 point increase pursuant (cont. next page)

These anomalies demonstrate that the Guidelines are not reasonable under the unique facts of this case, and would result in a sentence incongruous with the goals articulated in Section 3553(a).

## 2.   Abuse of Trust Enhancement

The PSR recommends a 2 point enhancement for "abuse of trust" pursuant to USSG § 3B1.3. It states that "[t]he defendant represented that a federal prisoner placed sufficient trust in the defendant as his spiritual advisor that he would follow the defendant's instructions regarding whether or not to reveal information to the authorities about the wrongdoing of another. The defendant's entire scheme was, in fact, based upon the premise that he had control over the inmate because of his relationship with the inmate as his rabbi." (PSR, ¶62).

The trial record does not establish whether the defendant actually had such a relationship with Regensberg. Possibly anticipating this fact, the PSR states that "Application Note 3 [to §3B1.3] provides that 'this adjustment also applies in a case in which the defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust when, in fact, the defendant does not.' " (PSR, ¶62). However, the PSR fails to quote the rest of the Application Note, which reads as follows:

> "For example, the adjustment applies in the case of a defendant
> who (A) perpetrates a financial fraud by leading an investor to
> believe the defendant is a legitimate investment broker; or (B)
> perpetrates a fraud by representing falsely to a patient or employer
> that the defendant is a licensed physician. In making the
> misrepresentation, the defendant assumes a position of trust,

---

to §2B1.1(b)(8) - - "If the offense involved (A) a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization, or a government agency." (Emphasis added.) Clearly, the defendant made no such misrepresentation. If anything, he was acting on behalf of the school. If he misrepresented his connection to Regensberg, Regensberg does not qualify as a "charitable, educational, religious, or political organization, or a government agency."

<u>relative to the victim</u>, that provides the defendant with the same opportunity to commit a difficult-to-detect crime that the defendant would have had if the position were held legitimately." (Emphasis added.)

As can be seen, the focus is on whether the defendant assumes a position of trust with respect to the person to whom he makes the misrepresentation, namely the victim - - in this case SAC. There can be no serious claim here that the defendant assumed a position of trust relative to SAC, regardless of whether his representations to SAC about Regensberg were true or false. Therefore, the "abuse of trust" enhancement does not apply.

3.     <u>**Prior Arrest**</u>

The PSR devotes considerable space to outlining a matter that dates back many years and resulted in a deferred prosecution (PSR, ¶¶ 72-90). It should have no bearing on the appropriate sentence in this case. Because the PSR does delve into it, the following observations are necessary.

- The account into which the HUD funds were deposited had more money in it than the $700,000 from HUD. The HUD funds did not have to be segregated in a separate account, and were thus co-mingled with the school's general operating funds.

- Contrary to the implication in ¶ 82, it was demonstrated to the satisfaction of the United States Attorney's Office that no personal expenses were paid for with HUD money, because the general operating funds more than covered the Balkany expenses without touching the $700,000 grant.

- All the HUD money was used to defray expenses of the school, although not used to pay down a mortgage as specified in the grant.

- The United States Attorney's Office decided that a deferred prosecution was warranted, under which the defendant remained on pretrial supervision for six months,[9] which he successfully completed.

### III.  EXTRAORDINARY GOOD DEEDS AND COMMUNITY SERVICE

The hallmark of Milton Balkany's adult life has been service to his community, through his decades-long dedication and devotion to Bais Yaakov, his generosity in welcoming those less fortunate into his home for food, warmth and on occasion domicile, and his countless acts of kindness to people who needed help.

The Sentencing Guidelines list a series of personal characteristics not ordinarily relevant in determining whether a sentence should be outside the applicable Guideline range.  Section 5H1.11 is one of them, stating that "[c]ivic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a departure is warranted."  However, courts are authorized to downwardly depart "if the [discouraged] factor is present to an exceptional degree or in some other way makes the case different from the ordinary case when the factor is present." Koon v. United States, 518 U.S. 81, 96 (1996)(emphasis added).  This is clearly such a case.

When the Guidelines were mandatory, before United States v. Booker, 543 U.S. 220 (2005), courts were authorized to grant a downward departure for community service in the exceptional case.  United States v. Canova, 412 F.3d 331, 358 (2d Cir. 2005).  This is even more true now in the post-Booker advisory Guidelines era, where the 18 U.S.C. § 3553(a)(1) factors have renewed vitality:

---

[9]    The restriction on the defendant's contact with the Bureau of Prisons, as noted in ¶ 85a, was limited to that six month period.

> "[T]he Sentencing Reform Act as interpreted and rendered
> constitutional by the Supreme Court's decision in United States v.
> Booker, 543 U.S. 220 (2005), requires sentencing courts to treat
> the Guidelines only as a starting point, and then to craft an
> appropriate sentence taking full account of 'the history and
> characteristics of the defendant.' 18 U.S.C. §3553(a)(1)."

United States v. Preacely, 2010 WL 5156384 at *11 (2d. Cir. 2010) (J. Lynch concurring).

This echoed earlier language from the Circuit, emphasizing individualized sentencing and

adherence to the parsimony clause of §3553(a):

> "It is now, however, emphatically clear that the Guidelines are
> guidelines – that is, they are truly advisory. A district court may
> not presume that a Guidelines sentence is reasonable; it must
> instead conduct its own independent review of the sentencing
> factors, aided by the arguments of the prosecution and defense.
> District judges are, as a result, generally free to impose sentences
> outside the recommended range. When they do so, however, they
> 'must consider the extent of the deviation and ensure that the
> justification is sufficiently compelling to support the degree of the
> variance.' [Gall, 128 S.Ct.] at 597. In this way, the district
> court reaches an informed and individualized judgment in each case as to
> what is 'sufficient, but not greater than necessary' to fulfill the
> purposes of sentencing. 18 U.S.C. § 3553 (a)."

United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008).

As Judge Gleeson recently wrote in determining an appropriate sentence under the fraud

guideline, in language just as apt here:

> "[[T]he defendant's sentencing] shows how the fraud guideline,
> despite its excessive complexity, still does not account for many of
> the myriad factors that are properly considered in fashioning just
> sentences, and indeed no workable guideline could ever do so.
> This reality does not render the Guidelines irrelevant in fraud
> cases; they are in fact quite useful in all sentencings. But
> sentencing judges know that a full consideration of 'the nature and
> circumstances of the offense and the history and characteristics of
> the defendant,' 18 U.S.C. § 3553(a)(1), implicates offense and
> offender characteristics that are too numerous and varied, and
> occur in too many different combinations, to be captured, much
> less quantified, in the Commission's Guidelines Manual. A
> consideration of those and the other factors set forth in § 3553(a)

> produces sentences that are moored to fairness, and to the goals of sentencing set forth in § 3553(a)(2), but sometimes not so much to the advisory Guidelines range. Indeed, in some cases the fair sentence can drift quite far away from the advisory range, which is, after all, but one of eight factors the sentencing judge must consider."

United States v. Ovid, 2010 WL 3940724 at *1 (EDNY, October 1, 2010).

The "history and characteristics of the defendant" here are extraordinary. Your Honor has received 87 letters written on behalf of Rabbi Balkany. They are all testament to a life devoted to the needs of others, to decades of service to the least privileged of his community, whether to the families of young girls whose circumstances did not allow them to afford tuition at Bais Yaakov, or to the lonely or downtrodden who had no place to go on the Sabbath and found a welcoming home and family inside the Balkany residence, or to the countless people who were recipients of Rabbi Balkany's generous acts of kindness.

After reading these letters, the conclusion is inescapable that Rabbi Balkany has led a life of extraordinary commitment and devotion to his community and the doing of good deeds. As a close friend of 50 years and an educator himself, Rabbi Yaakov Krause says of Rabbi Balkany:

> "During my close to forty years of public service I have had the opportunity, literally, to interact with thousands of individuals from all walks of life and I have worked with many of them on charitable and humanitarian projects. Without any hesitation, I can unequivocally say that I have never come across an individual who, just as a private individual or citizen, has done so much for so many as has Rabbi Milton Balkany."

Then, after detailing Rabbi Balkany's service to community, Rabbi Krause closes with:

> "Rabbi Balkany is, without a question, the most selfless and giving individual that I know."

We know that Your Honor will read all the letters. For purposes of this section of our Memorandum, we have selected representative letters, which we refer to and quote from, which illuminate the extraordinary work and deeds performed by Rabbi Balkany over his lifetime.

13

A. **Bais Yaakov School**

Since 1971, Rabbi Balkany has been the leader of Bais Yaakov, a school for orthodox

Jewish girls in Brooklyn. Chana Rivka Flaum has written about Rabbi Balkany and the school.

Mrs. Flaum was a student there, a mother of a student, active in the school PTA, and school

administrator. Her memories from childhood include:

> "The one impression that I remember most vividly is how, in the
> rain, heat or snow, Rabbi Balkany stood at the glass doors of the
> 49th street building greeting each student with a warm "Good
> Morning" and a smile. We recognized this as a nice way to start
> our day. However, I understand that Rabbi Balkany used this time
> to not only connect with the students, but to notice if a child did
> not have a proper pair of shoes, a warm coat, or even if a child
> looked particularly sad.
>
> Then, quietly but with no delay, he would make sure that if a girl
> needed shoes, his secretary would contact the shoe store and make
> an appointment for the child and her parents to go pick out a pair
> of shoes paid for by the school. I later found out that one of the
> secretaries asked him why shoes were purchased at the local shoe
> store, rather than at Payless. The response was aside from the fact
> that the child deserved regular, good leather shoes that would be
> healthier for her feet, it was important that the girl be able to take
> pride and excitement in purchasing her very own shoes in a store
> just as her friends did."

As a parent, Mrs. Flaum recalls,

> "I watched as delicious leftover lunches from school were
> discreetly sent home to those families who could not afford to
> purchase regular meals for their supper. I saw children from
> destitute families welcomed into school and enveloped in warmth
> and treated like every other child, despite the fact that their parents
> were not paying tuition.
>
> Two particular girls had serious, but undetected, eating disorders
> and Rabbi Balkany would not give up or give in until these girls
> were eating and receiving the medical attention that was required.
>
> Agi, an immigrant girl, joined the school in the 8[th] grade, was
> unable to speak English. At graduation when she delivered
> valedictorian speech in perfect there was not a dry eye in the

audience.  Not many schools would put in the time, effort and love that made it happen."

As the school administrator, Mrs. Flaum writes:

"These attitudes and sensitivities are not limited to Rabbi Balkany's students.  Staff members seek Rabbi Balkany's help with personal issues - financial, needed advice or just a listening ear.

A teacher was going through a very personal and difficult fertility crisis. Rabbi Balkany was so sensitive to her. When she finally did have a baby, nobody was happier about the news then Rabbi Balkany!

The daughter of a teacher was going through a particularly difficult divorce.  Rabbi Balkany offered advice as well as offering to make any phone calls or write a recommendation letters that may help."

Another staff member had a fatally sick son, followed by a dying father and equally critical husband.  Rabbi Balkany patiently and caringly allowed her to take whatever time was necessary to be at the hospitals and to attend doctors' appointments."

* * * *

"Five years ago, Rabbi Balkany approached me and asked if I would take on the position of school administrator.  I learned that there was so much more to know about the specialness of Rabbi Balkany! At the best of times running a school is very difficult, but running a school with virtually no tuition income is a nightmare! Every day I watched Rabbi Balkany navigate through these difficult financial times.  Although I am always tempted to not allow a child back into school if their parents had not paid tuition, Rabbi Balkany's heart melts and always allows the child to remain in class. In other schools in the Jewish community there are affluent parents or contributors, however, at Bais Yaakov of Brooklyn Rabbi Balkany has always been a one-man-show.  He has never been able to enjoy the feeling of having a committee to fundraise for the school, or to help alleviate the intense pressure of meeting teachers' payroll, buying school books and feeding lunch to the students. The complete burden has always been on his shoulders.

On quite a number of occasions I have asked him, point blank, 'Rabbi Balkany, what do you need this for?  You've run a school for years. Maybe it's enough! There are so many other less-stressful things you could be doing with your life. Why aren't you

just home enjoying your grandchildren?' But every time, the response is the same. Rabbi Balkany smiles and explains the importance of having his school open:

* for the children and parents who need it and rely on it

* for the learning disabled children who have come to depend on the time, attention and benefits that they derive from Rabbi Balkany and his school

* for the parents who seek the stability of knowing that their children are in a safe haven

*for the staff that consider their jobs in this school their mission."

Similarly, Chaya Fried has a 26-year association with the school, first as a teacher, then as principal. She writes:

"Our school's credo that Rabbi Balkany developed and reiterates to the staff at the beginning of each school year is: 'Students can only learn, grow and thrive through happiness. A disturbed, nervous, troubled child cannot learn, cannot develop and become a future parent and functioning wholesome adult.' He constantly repeats almost as a mantra: 'Each child is not a child alone, but we are nurturing future generations.' Without any personal considerations he has sacrificed time and money and, most of all, himself, in the furtherance of these goals - and he has succeeded.

The number of students admitted to our school for no or minimal tuition is a staggering proportion of the student body, and Rabbi Balkany has had to assume the responsibility to raise the funds to cover the constant deficit. However, with his generous and altruistic spirit Rabbi Balkany goes many steps further beyond the school and its needs. Well aware of the parents' financial difficulties, Rabbi Balkany arranges for envelopes of money, packages of clothing or food to be distributed to help these students and their families. He follows the dictum of our Sages: 'If there is no flour, there is no Torah.'

* * * *

"Allow me to share a few case-histories:

* The B. family was dysfunctional; parents were separated and there was no real home. The four young daughters were not accepted by other yeshiva schools due to physical and emotional problems. Rabbi Balkany accepted them, supported them

16

materially and emotionally, and stubbornly refused to give up on
them. He instructed the staff to do likewise. The four girls
graduated and went on to higher studies and colleges.

* The S. sisters – from a broken home. Yocheved, bulimic and
anorexic, and Rivka, sad and tormented. Not accepted at other
yeshiva schools. Came to Rabbi Balkany. Not only were they
helped professionally, but most of all they were accepted with love
and were helped to develop self-esteem. Yocheved is now happily
married and Rivka is working in fashion design.

*Esther K. came from Israel and her parents begged to be accepted
to our school after being turned down elsewhere. With patience,
understanding, and lots of one-on-one, she became a motivated star
student, winning contest after contest. Her father said that she had
been one step away from being sent to a 'mental facility' in Israel.
Her mother's words were, 'Rabbi Balkany, Mrs. Fried, and Bais
Yaakov of Brooklyn saved my daughter's life.'

*Milka A. was angry at her world, school, her family and religion.
She cursed and blasphemed. When teachers recommended that she
be expelled, Rabbi Balkany requested, 'Let's keep trying. Don't
give up on her.' We didn't. He included the parents in an overall
strategy. The end result was that Milka graduated. On her last day
of school she wrote a letter of thanks that included: 'You always
told me that you at Bais Yaakov of Brooklyn believe in me and
that you pray that one day I will see that you were right – Today is
that day.'

A postscript – Milka came to our school recently to apply for a
teaching position for next year!"

Witness Abe Friedman's letter:

"In 1987 my wife had a serious nervous breakdown and I became a
single parent raising two infant children, one a 1 ½ year old son
and a daughter 3 months old. You can just imagine what was going
on in the home, but I tried my best and they are both lovely kids of
whom I am so very proud.

When my little daughter reached school age I began searching for
a private Jewish school to register her. Unfortunately due to the
fact I was a single parent school after school refused to accept her.
Why should they? Why didn't she deserve a chance like all the
other girls? Was it her fault on one else's fault that he mother was
ill and consumed with depression? I was at my wits end. And then

someone suggested that I try a school, Bais Yaakov of Brooklyn, as they are known to be more accepting.

I must say I was overwhelmed as the school staff warmly welcomed my little daughter and accepted her. This school was founded on the principle that all children, be they poor or from broken or troubled families, deserve a chance in life.

The founder and dean of the school is Rabbi Milton Balkany. He placed his mark on the school and has served as the guiding spirit and motivation for the staff and student body and he is the one head of yeshivas and Day schools who will always give a kid a chance. I once thought that this should be a fundamental of the work of education, but sadly, through experience, I found this was not so. Rabbi Balkany is unique and kind and so many kids owe their successes and the parents their peace of mind to this one man."

Another parent, Hana Berdugo, recounts her experience as a single mother recently

arrived from Israel:

"I came here and did not have a penny and I was very much alone. We moved into a little basement apartment but I had no money for food, for clothes and not for schooling. Here I was with two little girls who needed a proper Jewish education. No school wanted to take them as I needed full scholarships. It is a sad thing to say about those schools, but that is the truth. We had nothing and I mean nothing.

Then someone told me about Rabbi Balkany. He had a name for having a big heart and wanting to help people. So I went to his school and there I had an interview by one of the staff members and she told what the tuition would be. But even though it was lower tuition than the other schools, there was no way that I could even dream of paying the tuition. Then someone told Rabbi Balkany about my situation. To say that he was helpful or kind would be a complete understatement about the care and concern that he gave me and my girls. Not only was tuition free but he made sure that I had money to buy coats, clothes and shoes for them. And that was not all.

Before every weekend he made sure that I had a place to be with my girls for Sabbath meals. Through him we got food packages from the Tomchei Shabbos organization. It was amazing. He treated my girls as if they were his own daughters. And then I saw that he treated every girl in the school as his own child. On snow

days he would stand outside the school to make sure that every
child was safe when she walked from the bus into the school.
Rabbi Balkany is a man who cares."

Malka Grinberger was the principal at a girls school in Brooklyn, when it suddenly

closed in 1990.  After placing some of the students, she still had 70 children with no school for

Orthodox Jewish girls to attend:

> "I went to see Rabbi Balkany and thought he may take in a couple.
> His was a smaller school but he had a reputation for having a big
> heart.  Your Honor, he took them all in, no questions asked.  This
> included making arrangements for their transportation to and from
> school – and some of the girls lived in Mill Basin, a significant
> distance away – lunches and the families of these girls could pay
> very little tuition if anything.  Rabbi Balkany interviewed all of the
> girls and their parents and assured them that he would see that they
> would receive a good education.  I will never forget his words to
> me: 'I will not close my doors on these girls.  Education is the key
> to their success, and if I don't take them they'll just become drop
> outs.'  I can never ever forget those words and when I heard them I
> said a silent prayer of thanks to God."

Chana Grunbaum has been Rabbi Balkany's secretary at the school for about twenty

years.  She writes:

> "Over the years I have witnessed so many heartrending cases in
> which Rabbi Balkany has gone out of his way, far beyond any call
> of duty, to bring comfort and peace of mind to adults and children
> alike. Of them all, two stick in my mind or, rather, have a place in
> my heart.
>
> A number of years ago there was a matter in the school that needed
> urgent attention. Rabbi Balkany needed or demanded attention to
> certain details above all else that was happening in the school. I
> prepared the documentation and needed to speak with him and get
> his 'buy-in'. I was in his office when all of a sudden a little girl in
> the second grade, Esther, walked into his office. Rabbi Balkany
> looked at her with warm eyes and said 'Shaiffelah (dear little girl
> in Yiddish), what do you want?' She came up to him and showed
> him a picture that she had drawn. It was a silly little picture. But all
> of a sudden, Rabbi Balkany stopped everything he was doing and
> focused on the child. I turned to him and said 'Rabbi Balkany, we
> have important documentation to complete, we have a deadline.'
> Your Honor, I will never forget his response. He looked at me with

19

tears welling in his eyes, and said: '<u>This</u> is important. She has no
father - he passed away a few months ago, and I have to be her
father to which she turns to with her questions.' I will never ever
forget that message as to what is truly important and what should
come first - even in a work setting. After that day she would come
to his office regularly and he would put aside whatever he was
doing."

\* \* \* \*

"The other case that stands out in my mind is that of a teacher who
was very poor and apparently had no money for Sabbath meals. I
do not know why the husband was not earning and why he didn't
bring in any money, but the bottom line is, they did not have
money. Rabbi Balkany would help her out. In addition there is an
organization Tomchei Shabbos that packages food for the needy,
and distributes them anonymously on Thursday so that families
will have food for the Sabbath. When it was suggested that we help
this teacher receive Tomchei packages she remarked that her
husband did not allow them to accept charity packages. Somehow
he felt that it impinged on his honor and she was afraid to say yes
even though it would help her family. So Rabbi Balkany organized
for the Tomchei packages to be delivered to the school and they
were repacked into bags, and that's how she got them into her
home. With the same teacher, when it came to marrying off her
daughters, she had no money. Rabbi Balkany went and raised the
needed funds."

Chana Reicher is an educator and taught at Bais Yaakov.  After relating the story of a

young girl who was abused at home who Rabbi Balkany went out of his way to help, Ms.

Reicher writes:

"Without any fear of exaggeration, one can multiply such
circumstances by tens, if not hundreds, in terms of the lives that
Rabbi Balkany has not only touched but changed and helped for
the better. Many of the girls came from such homes and by force of
circumstances had to be the adults where the parent did not or
could not function properly. Some of the girls had had to be taught
how to do laundry, others housekeeping and cooking.

As the years went by the percentage of girls from troubled homes
increased. More than half the children in a given class had issues.
No school would take them. No one was interested in them. Some
of them had been asked to leave their previous schools. Others had
not even been given the chance to enroll. It was Rabbi Balkany

who took in all these kids and gave them a chance at life. He made
sure that the school was more than just a place for scholastic
achievement. It was to be the normal part of their lives that gave
them proper direction within a happy environment."

Bracha Retter, a parent of a Bais Yaakov student, reflects the sentiments of those who

have experienced Rabbi Balkany's goodness:

"Rabbi Balkany is a man who has dedicated his whole life to
helping others, especially children, widows and orphans, as well as
kids-at-risk. In many ways, I stand in awe of him. His meticulous
care of the girls in his school is altogether rare. He knows the name
of every single child. To young and old he is always courteous, and
has a good word for everyone. He has a hearty smile that makes
everyone feel that if you need anything he is the one who could
help"

Alan Vinegrad, known to Your Honor as an outstanding attorney, has represented Bais

Yaakov for many years.  His thoughtful and comprehensive letter encapsulates what Bais

Yaakov and Rabbi Balkany have meant to the community and to countless needy families and

students.  Mr. Vinegrad writes:

"Bais Yaakov is well-known - not just in Brooklyn but throughout
the country and beyond - as a leading educator of learning disabled
children.  A significant majority of the school's student population
is, and has been, comprised of children with a variety of learning
disabilities and who were unable to receive, or benefit from, a
standard education in the community's other schools.  Over the
course of nearly 40 years, Bais Yaakov has served as a refuge and
educational institution of last resort, for children who otherwise
would be without educational opportunity.  It has provided an
exceptional and unique level of education and related services,
allowing literally thousands of young girls to thrive and succeed,
both in school and in their ensuing adult lives.

For example, Rabbi Balkany was an early advocate of
"mainstreaming" learning disabled children - allowing them to
attend classes with other students, rather than removing them from
the classroom and segregating them from their peers.  By utilizing
this approach, Rabbi Balkany provided these children with a
stronger environment for promoting their intellectual development,
interpersonal skills and self-worth.  This educational philosophy
has since been implemented widely throughout the country and

was even endorsed by the federal government, as reflected in The Education for All Handicapped Children Act of 1975. Indeed, it is educational innovations and successes such as these that have caused other schools (including religious schools of other denominations) to reach out to Rabbi Balkany for help on how they can replicate his exceptional successes in their own schools.

Rabbi Balkany has brought his educational vision to bear on behalf of thousands of children over the years in many other ways. He provided education not simply in religious subjects but also in secular ones - creative writing, multiple courses in chemistry, and upper level mathematics, to name a few - that were unavailable at many other religious schools. He provided special workshops for teachers to improve and enhance their skills. He invited literally dozens of children's book publishers to the school, along with other "competitor" schools, so that these schools could improve their level of instruction. He created a Sunday school program for his students - including special instruction in everything from baking and sewing to music and art and dance - so they could broaden their educational horizons and become more well-rounded individuals. He created a vocational institute at the school, so that dozens of students could spend one year after high school learning practical working skills and trades (such as paralegal work and bookkeeping). He created a Brooklyn-based summer day camp for underprivileged children as an urban alternative to the upstate New York camping experience enjoyed by children of greater means - thus providing them with recreational opportunities that they could not otherwise afford. The list goes on, but the central theme is the same: Rabbi Balkany has been uniquely singular and committed in his devotion to the children of Bais Yaakov, whatever their limitations, and strived for nearly 40 years to provide them with educational opportunities and a better life when others were unable or unwilling to do so.

But his commitment to these children does not stop there. Bais Yaakov is well-known in the community for its commitment to the education of children regardless of economic circumstance. The vast majority of Bais Yaakov's student population cannot afford the "normal" tuition requested by the school; thus, rather than pay the $500 a month that is expected of students from families of means, many families pay far, far less - even as little as $100 a month or under - and Bais Yaakov welcomes them with open arms. But Rabbi Balkany goes further, ensuring that children in need of food, or clothing, or a new pair of shoes, get what they need to sustain themselves, at the school's expense. As is obvious, then, the school relies heavily on funding from other sources - primarily federal subsidies and, to a much smaller extent, private donations -

for its survival. And it has always been Rabbi Balkany who played a critical role in ensuring, year after year, that these sources of funds remain viable.

Mr. Vinegrad concludes with:

"I understand that many others have written to Your Honor. I trust that there has been an overwhelming outpouring of people bearing witness to Rabbi Balkany's good deeds and service to his community. His generosity, his selflessness, his doing for the betterment of others, cannot be overstated. Your Honor has seen a view of Rabbi Balkany that is dark, and for that punishment must be imposed. But Your Honor, through this and all of the other letters, I hope and expect that you will see the beneficent side of Rabbi Balkany, in which he possesses and exhibits the positive characteristics which we hope all members of our community would admire and hope to emulate. The scale on which he has done it over his lifetime is monumental. The literally countless number of disadvantaged people he has assisted over the decades is staggering."

## B.   <u>The Balkany Home</u>

Rabbi Balkany and his wife Sara have made their home into a welcoming haven for those who need a meal, or companionship, or a warm place to rest. Many of the letters attest to Rabbi Balkany's - - and his family's - - generosity of spirit in sharing what they have with others less fortunate.

Faigie Ackerman writes:

"Loneliness, Your Honor, I can tell you is one of the worst afflictions that a person can experience. Coming home from a long day's work to open shades and a dark apartment takes its toll. There is always a lot of pressure at work and especially in a family oriented faith, spending Sabbaths and festivals alone is very painful.

I will never forget how so many years ago, when they found out that I was alone, that I was invited to Rabbi Balkany's home for a Sabbath meal. Ever since then, for almost two decades, I have become a member of their household! Every Sabbath I am invited for the Friday evening meal and for Saturday dinner, as well as for all the festivals. Going to Rabbi Balkany's home brought a light into my life and it gives me the ability to face the weekdays'

chores and challenges because I know that when the peace of the Sabbath arrives I will be in the embrace of his family.

He is tremendously giving and very warm and his home always has an open door. I cannot recall one occasion when anyone was turned away. On average, besides their own large family, there are fifteen to twenty people – some homeless, others lonely, and still others troubled - at their table at each of the Sabbath and festival meals. Yes, every week. And if more come another table is brought out and more chairs are added, so that even thirty people will not faze the welcoming gesture of Rabbi and Mrs. Balkany. The Balkany children help serve everybody and the food is always delicious. Rabbi Balkany treats everyone the same whether they are poor or whether they are rich, whether they are young or whether they are old. He welcomes in everyone with a warm smile and open heart."

Molly Bandes writes:

"I know Rabbi and Mrs. Balkany for ten years. For me both he and she are like angels sent from God. It is very difficult and sad to be alone and that is why going to their home every Friday night for the Sabbath meal and then for Saturday dinner is a light of sanity for me in this world. I suffer from diabetic neuropathy (a degenerative state of the nervous system) and find it very difficult to walk. Rabbi Balkany makes sure that I don't feel alone at this time in my life. I also attend Mrs. Balkany's class on a Tuesday and have lunch there, which is offered to all who attend.

Rabbi and Mrs. Balkany really go out of their way and they are extremely nice in offering food and making people part of their home. They have a wonderful family and their children and grandchildren help them serve the meals, often to 30 or so guests like me. At each meal the rabbi gives a short explanation on the weekly Scripture or some other topic and is both fascinating and enlightening. He does not sit like a 'lord of the castle' but rather gets up to serve tea and cake etc. He is extremely giving and I think he is the nicest person in the whole world."

Rabbi Sholom Geisinsky writes:

"I first met Rabbi Balkany when I was a youngster studying in yeshiva in Crown Heights. Every year, on the festival of Shavuos (Pentecost) a group of us would walk to Boro Park in an effort to enhance the spiritual atmosphere in local synagogues. It was in the Balkany home where we were invited for the evening festival meal. We were amazed how they accommodated us all, over and

above the crowd of people that were also regular Sabbath meal guests at their home. These guests were a very disparate group from all sorts of backgrounds and with different issues. Some were regular beggars, others infirm, and others elderly folk. The common denominator was that they were lonely people with nowhere to go.

Rabbi Balkany waited on them, personally, and presided over the meal like the Biblical Abraham who welcomed all who came to his tent. All that Abraham required from them was that they should recite grace for their meal. And Rabbi Balkany emulates that trait. Judge, some of those people have been coming to his home every single week for over twenty years!

In my classes, I have used Rabbi Balkany as the example of tolerance, understanding, kindness and outreach. He is a soft-spoken man and shares much wisdom.

When I sought a rabbinical position he was the one to whom I turned for help and he was more than gracious in his efforts. Years ago when my father was not well with cancer, and from which he passed away in 1992, Rabbi Balkany reached out to me and spoke to me like a son, giving me encouragement and empathy. He helped me build up my faith and trust in G-d, something for which I will be forever grateful."

Tzipporah Green writes:

"The reason is that for the last fifteen years Rabbi Balkany has represented life to me, nothing less. I am sure with most people they do not have someone who means so much, especially a person who is not one's relative or friend.

I met Rabbi Balkany and his family fifteen years ago. I lived alone in an apartment across the road from his home, and every Sabbath I had always observed a group of people that would gather at his door as if waiting for someone to return. I assumed that these were family members. What I eventually did find out was that the house was the home of Rabbi Balkany and none of these people were members of his family. They were lonely, single people like me who had no family nearby and who spent the Sabbath and festivals alone.

I, too, had no family and nowhere to go on the Sabbath and a friend said I should just knock on the door and introduce myself and I would be welcomed in, instantly. I was too shy to do so and my friend introduced me to Rabbi Balkany. The man opened his

home to me, just as he did for the others, and I became one of those 10, 20 or even 30 people that come to his table every Friday night and Saturday dinner, as well as on every Jewish festival. And so, for all these years every single week, 52 weeks a year and all the festivals, I have been a member of his 'family'. It was as if he and his wife were able to push back walls and raise ceilings to accommodate more people. When the food was served you could not see the plate. They were never miserly with the food that they gave out. Two years ago when my landlady sold the building and all the tenants had to move I was living in the basement apartment. I had no place to go. It was at that time I was admitted to Maimonides and I had to put my furniture in storage, which I could not afford. Rabbi Balkany told me not to worry and since then, every month, Rabbi Balkany has paid the storage for my furniture."

Aaron Schichtman writes:

"I work as the administrator at Yeshiva Gedola of Midwood for at-risk youth and I am also the kosher food supervisor at the Palm Tree Nursing Rehabilitation Center. In the former I see the ravages that the culture of the streets is doing to our youth. In the latter I see many elderly and lonely, and what becomes of them, especially when their families do not come to visit them. Those who can help them are truly angels of mercy that are sorely needed. One such 'angel' is, unquestionably, Rabbi Balkany,

Originally from Cleveland I came to New York seventeen years ago and I met Rabbi Balkany about ten years ago. However, it is during this last year that I have become close to him and every second week I join him at his home for the Sabbath meals. They have a simply furnished house, not lavish, but it is a home to so many people, especially the elderly, the lonely, and wayward youth.

Rabbi Balkany really looks out for others and the way he treats his guests is a lesson in kindness of Biblical proportions. Many of those who find themselves at his table and who also have issues would not be welcomed in most of the homes that I know. Some are mendicants and are extremely disheveled and others are teenagers rebelling and who have been thrown out of their homes or ran away. While outside of Rabbi Balkany's house they are loud and discordant, in his home there is a calm that envelops everybody. He leads the calming and spiritual singing of Sabbath hymns and his words and messages are always inspiring, and we all have tremendous respect for him."

Sara Rachel Siegel writes:

> "My name is Sara Rachel Seigel, an immigrant from Haiti. I came to the Untied States more than twenty years ago and after some time I found myself attracted to Judaism and I converted and accepted that faith.
>
> I married a Jewish man and I hoped that it would be a fulfillment of a dream and the beginning of a good life. Unfortunately, it was a nightmare. He was a crazy man and very abusive and we were divorced thirteen years ago. I had one son, Nachum, who is turning eighteen. It was such a bitter marriage that I pray I will have a chance to find happiness.
>
> In the meantime I live all alone. Not long before my divorce was finalized the pressure and loneliness took a big toll on me until someone told me that near to where I live is a place where they welcome you, they welcome everybody, especially on the Sabbaths and on Jewish festivals, and it was also a place where a person could eat. I thought maybe it was like a soup kitchen but nothing prepared me for the home of Rabbi Balkany.
>
> I have never seen anything like it in my life and I have been in different parts of the world. I have never seen a house open like this. Rabbi Balkany is such a generous person and he helps everyone. I know there are many people who have money but they do not share. Whatever he has he shares with the entire world. He helps them to have food and to sit in a clean place."

Rabbi Moshe Meir Weiss writes:

> "Rabbi Balkany's persona is consistent out of the school milieu as well. Without any word of exaggeration, his home is a place of wonder. A large dining room table with four tables at right-angles is the Friday night and Saturday dinner gathering place of the elderly, the indigent, those from broken homes, and others who are just lonely. Both in his professional life and his private life Rabbi Balkany has often been the last bastion of hope for many troubled souls."

## C.    Acts of Kindness

Many of the letters reflect the author's anecdotal recollections of Rabbi Balkany's random acts of kindness, occasions when Rabbi Balkany went out of his way and extended himself simply to be of help to someone else.

Marvin Aronoff, one of the regular Sabbath guests at the Balkany home, writes:

> "Just last year he really went out of his way to help me. I had a
> hernia op scheduled at the hospital on 202nd Street in the Bronx.
> You know what he did? He drove me all the way there, waited in
> the hospital for six hours until after the op, and when he was sure
> that I was okay only then he went home to Brooklyn. To me that is
> a big human being and friend."

Chaim Bookson, a parent of Bais Yaakov students, writes of the untimely death of his

daughter Naomi and of Rabbi Balkany's deep compassion:

> "People know for comfort and for solace, for friendship and
> encouragement, Rabbi Balkany is the person par excellence.
>
> Just how true this is was brought home to us this last summer. Our
> daughter, Naomi, had fought a long bout with cancer and passed
> away on a Sunday morning.  It is customary in our faith to conduct
> a funeral on the day of death or as close to it as possible. Naomi
> was to be buried in the Holy Land and the casket was scheduled to
> leave on the El Al flight at 4 pm.
>
> That same Sunday was the visiting day for families with children
> at sleep away camps in the Catskills and is a virtual exodus of our
> community. We did not expect people to attend the short service
> that was to be held at the airport. Apparently Rabbi Balkany was
> well on the way to the Catskills when he heard the news. Without a
> question he turned around and drove directly to JFK airport and
> delivered a eulogy to all who had gathered there. Like all his
> students Naomi and our other daughters felt very close to Rabbi
> Balkany and his words just meant so much. His soft way and
> caring nature helped us through a parent's worst nightmare,
> especially during the week of mourning that we observed on our
> return."

Yitzhak Cweiber was a rebellious teenager growing up in a very religious home

environment.  Eventually his parents threw him out of the family home, and he moved  in with

friends in Brooklyn.  He writes:

> "That's where I met Rabbi Balkany. He had befriended them and
> would come past every day to pick up the guys to attend the
> evening synagogue services with him. At first I was not interested
> but my friends said that he's a good guy and I should join them.
> One day I did and that day was the new beginning of my life. I

came to love him as a parent and as a friend. His wife was like my mother and his children are like my sisters and brothers until this very day.

You may ask how we became so close. That is because one day he invited us guys to move into his home, and eight of us did! They gave us two rooms and their children into whose rooms we moved, moved in with their other siblings.

Rabbi Balkany and his wife were amazing to us. There was nothing they would not do, anything that we needed. He gave us pocket money. He bought us clothes as we needed. For my birthday he gave eight new shirts. I remember when putting them on that I felt good and worth something. He gave us access to his car and even bought an extra second hand car that we could use. He created an atmosphere where there was harmony, and never put pressure on us. Rather he led by example and, in the beginning grudgingly, we were happy to follow. With him we could be ourselves. There was nobody screaming at us and we had a warm place to come back to. We spoke to his wife as if she was our mother – she is an amazing woman and we all love her."

\* \* \* \*

"Near to the Balkany home is the Lakewood Minyan (Synagogue), which is also a study hall where scholars can be seen with their tomes of Talmud at any time of the day or night. Rabbi Balkany arranged for private tutors, Talmud scholars in their twenties, to learn with each of us, one-on-one. He did this not just for one day or one week or even for one month. For two years, almost every single day, he arranged to cover the cost for us to study Torah. At a going rate at that time of $40 an hour, it was an incredible undertaking on his part. But, learn we did and he made sure that we lived a Jewish life and developed the sense of responsibility to be married and to have Jewish homes. As if this was not enough, towards the end of the two years, Rabbi Balkany even investigated the possibility of purchasing a business for us guys to be a business of our very own.

There is no one in this world, and certainly not even our parents, who did for us or gave us a chance as Rabbi Balkany did. And he did so with no thought of thanks, and certainly no reimbursement. Each of us is eternally grateful for his incredible heart, his caring and his kindness."

Chaya Czeisler, a former student at Bais Yaakov, recalls:

> "I have a personal memory of an incident that happened when I was in the eighth grade. I had an argument with another student and ran out of the classroom and stood crying in the corridor. Rabbi Balkany always walked the corridors to see what was going on and when he found me in tears he took me into his office to find out what was going on. When I told him what had happened he called in the other girl, helped us clear the air and made sure that we made up. He also showed such kindliness to the entire student body. Once a month he would assemble the school and personally give special treats to each of the girls. That kind of touch made an important impression on every student."

Basya Deitsch was a childhood friend of one of Rabbi Balkany's daughters, and visited the Balkany home on many occasions:

> "On several occasions when I visited his house I met a young lady who always seemed to be around. The Balkany girls told me that their father had made arrangements for her to live with them. She came from a very troubled home and needed to be in a healthy and thriving environment. Rabbi Balkany and his family embraced her as one of their own, eventually helping her marry and set up a home of her own."

Michal Dillman was a recent arrival in New York City, whose mother knew Rabbi Balkany and alerted him to her daughter's presence:

> "My mother knew of Rabbi Balkany and called him to let him know that I was in New York, and also to tell him about my working skills, which include computers and graphics and could he help me. Without any hesitation Rabbi Balkany told her she that she should tell me to come to the school the next day as he had a job available. Did he really have a job waiting? Until this day I do not know. What I do know is that he just wanted to help, even sight unseen, and he certainly did so – a job, a home away from home, and most importantly he helped regularize all my immigration papers and status. It is now six years later.

> In the interim my parents moved to Lakewood, NJ. I was blessed to be married earlier this year and we live in Lakewood, NJ. Even so, every day I commute to work at Rabbi Balkany's school in Brooklyn because it is the most positive milieu where one could hope to work. Over the years whenever I spoke with Rabbi Balkany he emphasized one theme, that the girls should find the school a happy place and a source of love and comfort. And I have tried to support this aim, whether it is graphics I create, the décor

30

or even videos. Everything is geared toward this one aim of ensuring a wonderful and happy school experience."

Mrs. Dillman recounts the following anecdote:

"There is one incident to which my mind symbolizes who Rabbi Balkany is. A few years ago he was in Jerusalem and while walking through the streets he came across a lady begging for alms. He recognized her as one of the ladies who used to frequent his Sabbath table and who had relocated to Jerusalem. He was shocked that she was reduced to such circumstances and immediately went out of his way to make sure that she and her family would be assisted with having food and the ability to live with dignity."

Bernard Fuchs has known Rabbi Balkany for 50 years. He relates the following:

"I have a very personal appreciation of Rabbi Balkany that I wish to share with the Court. My mother is today a lady of 90 years, but her twilight years have darkened as her memory has now faded away. She was widowed 27 years ago and moved to Florida where there are many other retirees. My siblings and I made regular trips to be there with her and she came to spend time with us in New York. However, as with other elderly folk, people tend to forget them over the years and it is usually only family members who keep in touch.

There is one special exception and to whom I will always feel grateful, and that is Rabbi Balkany. For many, many years he would spend some two weeks in Florida every winter. However, unasked and without any fanfare, every winter for the last quarter of a century, Rabbi Balkany would make a point of being in touch with my mother. Not just to call and say hello, but he would visit with her. He would call and offer to buy her groceries and other needs. And every Friday before the Sabbath he would bring her flowers, and would go to her apartment to recite the Sabbath table prayers with her. He certainly did not have to do all that, and no one could have had anything to say had he not done so. But he did it, and he did it so graciously and kindly. It always meant so much to her that she was not forgotten, especially by someone involved with matters of the days and many causes like Rabbi Balkany. He made such a difference to her life, and I will never forget his kindness."

Hertz Hasenfeld is a neighbor of the Balkanys. He knows the Balkanys generosity:

31

"An example of his incredible outreach: For two years he had a
group of teenage boys living in his basement. This was a very
special group. They each came from good, if not illustrious,
families in the community, all families of over-achievers. These
kids, however, were under-achievers. They were rebels to their
homes. They did not fit in with their families, their homes, and
their society. They were one step from dropping out totally and
sliding downward in a spiral into drugs, crime and probably prison.
Yet, Rabbi Balkany worked with these kids with love, dedication,
wisdom; and it all cost lots of money – his own money that he had
to raise.

Once, I was on vacation in Florida, and I bumped into him with
this same group of boys. I was really surprised until he explained
that for the last 3 weeks each of these kids got up every day no
later than 8 a.m. This was a milestone for a group that used to
party all night and sleep during the day. He promised them a trip
to Florida if they changed their lifestyle for a minimum of 3 weeks.
They worked at it and he kept his promise. In the end he actually
turned these kids around so that they are now all married, hold
down good jobs, and are productive citizens. This is but one of
hundreds of stories involving the caring nature of Rabbi Balkany."

Rabbi Mordecai Kamenetzky is the Dean of a yeshiva on Long Island, a school which

Rabbi Balkany has assisted over the years. Rabbi Kamenetzky writes that Rabbi Balkany has

been selfless in his help to the yeshiva, but even more importantly he is available to people in

need:

"On a personal level, Rabbi Balkany has the eternal thanks of my
own family. I will never, ever forget what he did for our son,
Yehudah, who was diagnosed with a brain tumor – the nightmare
of any parent. We desperately sought the doctors and hospital that
could best treat him, and it turned out to be Duke University in
North Carolina. How to get in, let alone be treated? It was Rabbi
Balkany who ensured that the doors were opened for us and the
medical staff helped save Yehudah's life."

Dr. Harvey Lang has known the Balkany family since 1984, but as he writes, they were

not close friends. However, the following occurred:

"Personally, I will never forget the kindness that he once extended
to me.

32

At 1 a.m. after concluding an engagement party for one of his daughters he called me to say that he had noticed that I was very pale and perturbed – this in the middle of his own celebration. He was concerned and did not want to wait until morning and wanted to know if he could be helpful and what was going on. I told him that a few of years before I had borrowed money in the amount of $75,000 from a friend in Florida who had recently died, and there was a balance of approximately $12,000 owing. That day the man's son had called me and threatened me, demanding $23,000 including the interest that he calculated. He had a very bad reputation as a loan shark and an 'underworld' type.

Yehoshua [Milton Balkany] asked me how much I had on hand, and I told him $3,000. He asked me for the man's phone number, called on my behalf and negotiated a settlement of $12,000. The next day he sent me a certified check for $9,000 so that I could clear that debt, and over time I paid him back. I found out later that Rabbi Balkany did not have the money available but went out raising and borrowing and put it together for me!

Judge Cote, I was not a member of his family. I was not even a close friend. He didn't have to do that, but he saw me in trouble and wanted to help."

Esther Stamm is the mother and grandmother of Bais Yaakov students. Hers was one of the countless families to receive tuition breaks from Rabbi Balkany. She remembers Rabbi Balkany's, and his wife Sara's, special kindness:

"I will never forget when my husband was very ill and on a respirator in the hospital that Rabbi and Mrs. Balkany came to see him every day and prayed at his bedside. When he finally came home they came to visit with him as well. This was remarkable because people in Rabbi Balkany's position and with such time constraints do not have extra time, but somehow he manages to do it all. Rabbi Balkany is a person who tries to help others constantly. Their home is on a first floor and if one looks at the furniture and decor much is old and threadbare. What Rabbi Balkany has he either gives away or shares with others."

Nissi Streicher has known Rabbi Balkany for forty years, since she met him when recuperating from an operation. She has witnessed first-hand the Balkany generosity of home and spirit. She writes of a particular incident:

33

"A case in point is that of a young mother who doesn't have two pennies to rub together. Her ex-husband is cruel and malicious, gives her no child support and spends his time trying to pit their only child against her. He indulges the child and buys him gifts. With the upcoming birthday of the child the mother felt that once again the father would win another round. Rabbi Balkany heard of her plight, called her in and told her 'I know you don't have anything. Here is money for the birthday party of your child'. That gesture meant the world to her and she became close to Rabbi Balkany knowing that with him and his family she has a family and a home."

Gittel Wiznitzer was a teacher at Bais Yaakov, and has a very personal story to tell which illuminates the kindness and compassion of Rabbi Balkany:

"However, the consideration that Rabbi Balkany showed me personally is beyond any compare and I do not believe that in any other school I would have been treated in the same manner. I got married when I was teaching at the school and it was soon discovered that I had a fertility problem. While to any couple such a problem is significant, in our community where people are blessed with large families, 8-10 children is quite common, such a condition can be emotionally and socially catastrophic. I started undergoing treatments only to have our hopes dashed time and time again, and over time people used to look at me pitifully and then making comments among themselves. There were times when I did not know what was more painful, my circumstances or their whispering.

Sometimes the treatments schedules caused me to come late to school. On other occasions I had to go out of town. I went to discuss my situation with one of the principals and whether my salary should be reduced for time absent, especially as the school had to engage a substitute teacher whenever I was away. Rabbi Balkany would not hear of any such deduction. He felt that to compound my stress with docking the pay upon which my husband and I depended was not called for. He looked at me and treated me like his own daughter.

It took five very long years for me to conceive and when I told Rabbi Balkany that I was expecting he was ecstatic. However, there were many mornings that I could not get to school on time. He just told me not to worry and that he told the bookkeeper that until the baby would be born I did not have to clock in everyday. When our lovely daughter Chana was born he actually cried with joy at the news."

34

D.     **Family Life**

As Your Honor knows, Rabbi Balkany has been married for 42 years and has 13 children. Five of his children, Levi Balkany, Mendel Balkany, Audel Hecht, Devorah Vishedsky, and Hindy Wagner are representing the children in writing to Your Honor about their father. Your Honor also has a letter from the defendant's wife, Sarah. Their letters are eloquent and deeply moving, and need no elaboration from me. Each talks about Naomi, their 21 year-old Down Syndrome sister and daughter, and the extremely close bond between Naomi and her father. Moreover, Your Honor has letters from Dalia and Ruchama Reichman, and from Miriam and Joel Gold, who know from first-hand experience how important the defendant is to Naomi's well-being.

While certainly not the primary basis for urging a non-Guidelines sentence given the extraordinary good deeds and community service performed by Rabbi Balkany over his lifetime, the law is clear that a defendant's family circumstances and responsibilities may in certain cases warrant a downward departure, United States v. Galante, 111 F.3d 1029 (2d Cir. 1997); United States v. Alba, 993 F.2d 1117 (2d Cir. 1991), and therefore should certainly factor in the §3553(a)(1) analysis.

## CONCLUSION

For all the foregoing reasons, we respectfully request that the Court impose a non-Guidelines sentence that gives due consideration to the extraordinary record of lifetime service which Rabbi Balkany has selflessly given to his community. Were the defendant before the Court facing sentencing for the core offense represented by his conduct - - extortion - - the maximum possible punishment would be two years imprisonment, and with that in mind, and in

35

light of his extraordinary record of good deeds, his age and his health, and all the other § 3553(a)

factors, we ask the Court to impose a lenient non-Guidelines sentence.


Dated:  New York, New York
        February 9, 2011


                                    Respectfully submitted,
                                    Kelley Drye & Warren LLP

                                    By
                                        Alan R. Kaufman
                                        James M. Keneally
                                        101 Park Avenue
                                        New York, NY 10178
                                        (212) 808-5195
                                        Attorneys for Defendant Milton Balkany